UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
In re                                    :
                                         :   00-10922 (BRL)
MANHATTAN INVESTMENT FUND LTD.,          :   00-10921 (BRL)
et al.,                                  :
                    Debtors.             :      Jointly
                                         :    Administered
----------------------------------------x
BEAR, STEARNS SECURITIES CORP.           :
                                         :    Adv. Pro. No.
                    Appellant,           :     01-02606
                                         :
        - against -                      :
                                         :   07 Civ. 2511
                                         :      (NRB)
                                         :
HELEN GREDD, Chapter 11 Trustee for      :   **MEMORANDUM**
MANHATTAN INVESTMENT FUND LTD.           :   **and ORDER**
                                         :
                    Appellee.            :
----------------------------------------x

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Before this court is Bear, Stearns Securities Corp.'s ("Bear Stearns") appeal of the Bankruptcy Court's January 9, 2007 Memorandum Decision Denying Defendant's Motion for Summary Judgment to Dismiss and Granting Trustee's Motion for Summary Judgment. The cross motions for summary judgment were addressed to Count I of the complaint brought by the Trustee of the Manhattan Investment Fund (the "Fund"). Gredd v. Bear Stearns Securities Corp. (In re Manhattan Fund Ltd.), 359 B.R. 510 (Bankr. S.D.N.Y. 2007). Count I seeks to avoid $141.4 million of transfers made by

the Fund into its margin account at Bear Stearns in the year prior to Fund's bankruptcy.[1] The Bankruptcy Court ruled that the transfers should be avoided because (1) the transfers were made with "actual intent to hinder, delay, or defraud the Fund's creditors" as defined by Section 548(a)(1)(A) of the Bankruptcy Code (the "Code"); (2) Bear Stearns was an "initial transferee" under Section 550(a) of the Code; and (3) Bear Stearns failed to prove that it accepted the transfers in good faith under Section 548(e) of the Code. Bear Stearns maintains that each of these findings were erroneous.

For the reasons set forth below, we affirm in part and reverse in part.

## BACKGROUND

As this is the fifth opinion we have issued in this case, we only briefly review the facts.[2] The Fund was a

---

[1] We previously dismissed Counts II and III, which sought to avoid as fraudulent transfers monies that flowed into a separate "short account" that the Fund maintained at Bear Stearns. <u>Bear, Stearns Securities Corp. v. Gredd</u>, 275 B.R. 190 (S.D.N.Y. 2002) ("Gredd I"). Count II sought to recover $1.7 billion in proceeds from the Fund's short sales that stayed in the short account until the Fund closed its short sale positions. Count III sought to recover the $1.9 billion that the Fund paid to buy securities to close out its short positions at Bear Stearns. As explained <u>infra</u> at Part I.A, the transfers placed into these separate accounts occurred for different reasons and are subject to differing analyses.

[2] A fuller explanation of the facts is contained in <u>Cromer Fin., Lts. v. Berger</u>, 137 F. Supp. 2d 452, 461-64 (S.D.N.Y.

hedge fund controlled by Michael Berger, whose strategy of short selling technology stocks in the late 1990s, was financially disastrous.[3]  Berger hid the losses – which eventually totaled $394 million – by fraudulently representing that the Fund was profitable.  Concealing the Fund's status from its brokers, auditors, and other service providers, Berger persuaded new individuals to invest and paid off old investors with newly acquired funds.

**The Prime Broker Relationship**

Bear Stearns served as the Fund's prime broker.  In that capacity, it facilitated the Fund's short selling activities by borrowing stocks from third parties, selling them for the Fund, and placing the proceeds in a "short account" which credited the proceeds to the Fund.  See

---

2001).  In that securities fraud class action, District Judge Denise Cote dismissed the federal and state law claims against the Fund's various Bermuda-based auditors and other service providers, including Bear Stearns.  The plaintiffs alleged, among other claims, common law fraud, gross negligence, negligent misrepresentation, and professional malpractice.  Bear Stearns was accused of aiding and abetting the fraud by extending the Fund too much credit and failing to enforce applicable margin requirements.  The court dismissed this claim, holding that these allegations did not state an aiding and abetting claim as a matter of law.  Id. at 471-72.

[3] "A short sale is a speculative transaction where a security not owned by the seller is sold in the hope that the price of the security will decline, permitting the seller to later repurchase the security ('cover') and make a profit.  Typically, the seller borrows the security to be sold short from his broker and covers by later buying the identical stock and transferring it to his broker."  Bear, Stearns Securities Corp. v. Gredd, No. 01 Civ. 4379 (NRB), 2001 WL 840187, at *1 (S.D.N.Y. July 25, 2001).

Appx. to Def. Br. at A656 (Expert Rep. of Michael T. Curley). To close out its short positions, the Fund would direct Bear Stearns to repurchase the stocks and return them to the lenders. However, because Bear Stearns had originally borrowed the stocks, it was the party that had the obligation to return the stocks while the Fund had open short positions. As a result, if the Fund failed to cover, Bear Stearns was itself exposed to a loss.

**Margin Account**

To support its trading activity, in addition to the short account, the Fund was required to keep a separate "margin account" at Bear Stearns, which is the account at issue in Count I and herein. Under Regulation T of the Board of Governors of the Federal Reserve Board ("Regulation T"), the Fund was required to deposit into this account 50% of the value of any short positions that were opened on a given day – this is referred to as the "initial federal margin requirement." See id. at A655. In addition, Bear Stearns had its own "house" margin requirement of 35%, referred to as a "maintenance margin requirement."[4] This requirement meant that the Fund was

---

[4] This requirement was 5% above the independent 30% requirement for short sales mandated by the National Association of Securities Dealers, Inc. (NASD). It is standard for brokerage firms to have "house rules" in excess of the minimum NASD requirement.

obligated to maintain an amount equal to 35% of the value of its open short positions on deposit in its margin account at Bear Stearns at all times. During the year preceding the Fund's bankruptcy, the Fund transferred $141.4 million into this account to support its trading activity. Some of this amount was presumably transferred into the account to enable the Fund to establish new short positions and some of this amount was transferred to meet margin calls made by Bear Stearns to ensure compliance with its maintenance margin level.

The account agreement between Bear Stearns and the Fund contained provisions designed to protect Bear Stearns from the risk associated with the stock loans it made to the Fund. In addition to giving Bear Stearns a security interest in the money in the margin account, the agreement allowed Bear Stearns to:

    1) Set any level of maintenance margin for the account;[5]

    2) Prevent the Fund from withdrawing money from its account while there were open short positions supported by the account; and

    3) Use the funds in the account to liquidate the Fund's open short

---

[5] As noted, the margin maintenance level refers to the percentage of funds that a customer must maintain in a margin account at all times.

positions, with or without the Fund's consent.

SEC Rule 15c3-3 also applied to the arrangement between Bear Stearns and the Fund. It precluded Bear Stearns from using any monies in the account for purposes unrelated to the Fund's trading. <u>See</u> 17 C.F.R. § 240.15c3-3-(e)(2). It is undisputed that at all times Bear Stearns acted in accordance with the account agreement and SEC Rule 15c3-3.

**Bear Stearns's Inquiry Into Berger's Fraud**

Turning to the facts related to the notice Bear Stearns received about Berger's fraud and to Bear Stearns's response, we note at the outset that there is no suggestion that Bear Stearns had actual knowledge of or was a participant in Berger's fraud. The first inkling that there might be an issue with the Fund came in December 1998 when Fredrick Schilling, a Senior Managing Director at Bear Stearns had a conversation at a cocktail party with an individual from European Investment Management (EIM) who stated that the Fund was reporting a 20% profit for the year. Appx. to Def. Br. A971 (Dep. of Fredrik Schilling). At that time, Schilling believed the Fund was losing money and thus asked the individual to have his boss at EIM call Schilling the next day. The next day, Schilling received a

call from Arpad Busson of EIM, who asked if the Fund's reported performance corresponded to Bear Stearns's records.[6]  Id. at A1295-96 (Dep. of Arpad Busson).  That same day, Schilling also discussed the matter with others at Bear Stearns and was told that the Fund was indeed losing money.  In fact, the Fund had lost between $150 and $200 million in 1998 alone.[7]  See Appx. to Pl. Br. A773-74 (Dep. of John Callanan).

After the call with Busson and internal discussions, Bear Stearns arranged a call with the Fund's introducing broker – Financial Asset Management – and Berger himself. Berger said that the discrepancy between the losses sustained in the Bear Stearns account and the Fund's reported performance was due to the fact that the Fund used as many as eight other prime brokers to carry out its investment activities.  Appx. to Def. Br. A994 (Dep. of Fredrik Schilling).

While Bear Stearns apparently viewed Berger's explanation as reasonable, it nevertheless did not cease its inquiry into the Fund's activities.  Bear Stearns

---

[6] Concerned that it would violate confidentiality rules to disclose this information to Busson, Schilling had him submit a written request that Schilling passed on to Bear Stearns's legal department.

[7] However, Schilling claims he was unaware of these numbers at the time.  See Appx. to Pl. Br. A714 (Dep. of Fredrik Schilling).

contacted the Fund's administrator to make sure that it was receiving the Fund's daily trading activity reports produced by Bear Stearns. Id. at A1032. Schilling also contacted the Fund's auditor, Deloitte & Touche, to inform it of the inquiry into the Fund's performance and of Berger's explanation. Schilling also asked "Deloitte to be keen and careful with respect to the Fund's upcoming audit." Def. Br. at 36 (citing Appx. to Def. Br. A976 (Dep. of Fredrick Schilling)).

Months later, Schilling met Busson at a conference and was told that because Berger refused to release the Fund's financial information – including the list of prime brokers being used by the Fund – to EIM without a confidentiality agreement, EIM was in the process of redeeming its clients' investments in the Fund. Appx. to Def. Br. A1051-52 (Dep. of Fredrick Schilling). According to Bear Stearns, it was informed by Deloitte in the spring of 1999 that the Fund's audit had occurred without issue and that the Fund was in good standing.

In the fall of 1999, Schilling continued to have discussions with industry contacts about the Fund and also spoke with another Deloitte auditor to urge caution. By November 1999, Bear Stearns was making margin calls to the Fund almost daily and was considering raising the Fund's

maintenance margin requirement. <u>See</u> Appx. to Pl. Br. A450-51, A592 (Dep. of Christopher Engdall). In December, a series of incidents led Bear Stearns to have renewed concerns about the accuracy of Berger's story.[8] Thus, Bear Stearns ran a credit check – which did not show more than one prime broker – and called a number of other prime brokers and learned that they had no relationship with the Fund. <u>Id.</u> at 1085-86. After accepting a confidentiality agreement, Bear Stearns was able to obtain the Fund's financial statements, which revealed that the Fund had only one prime broker. <u>See id.</u> at 1091. Bear Stearns then reported the Fund to the SEC, marking the beginning of the end for the Fund.

## <u>DISCUSSION</u>

Our jurisdiction to hear this appeal of the Bankruptcy Court's order derives from 28 U.S.C. § 158(a).[9] We review

---

[8] First, Schilling met a former marketer of the Fund who complained that he was suing Berger because Berger had not paid him for his work. Second, Schilling learned that the Deloitte entity that he had believed was the Fund's auditor was not the Fund's auditor. Third, he reviewed the answers to questions another investor had received from the Fund and felt they were inadequate. Appx. to Def. Br. A1080-81 (Dep. of Fredrik Schilling).

[9] This section states: "The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a).

the Bankruptcy Court's order of summary judgment <u>de novo</u>. <u>Shimer v. Fugazy (In the Matter of Fugazy Express, Inc.)</u>, 124 B.R. 426, 430 (S.D.N.Y. 1991); <u>see also</u> <u>Adelphia Business Solutions, Inc. v. Abnos</u>, 482 F.3d 602, 607 (2d Cir. 2007). Summary judgment is appropriately granted to a party if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[10] Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Thus, the Bankruptcy Court's ruling should be affirmed if, based on the evidence, a reasonable jury would have to conclude (1) that the transfers into the Bear Stearns account were made with "actual intent to hinder, delay, or defraud the Fund's creditors" as required by Section 548(a)(1)(A) of the Bankruptcy Code; (2) that Bear Stearns was an "initial transferee" under Section 550(a) of the Bankruptcy Code; and (3) that Bear Stearns did not accept the transfers in good faith. In making these determinations, we are required to "resolv[e] all conflicts in the evidence and draw[] all reasonable inferences in favor of" Bear Stearns.

---

[10] As the Trustee prevailed on her cross-motion for summary judgment motion below, she is the moving party for purposes of this appeal. <u>See</u> <u>Barry v. Liddle, O'Connor, Finkelstein & Robinson</u>, 98 F.3d 36, 37 (2d Cir. 1996)(treating the party that lost on its cross-motions as the non-moving party for purposes of the appeal).

Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.), No. 01 Civ. 6209 (DC), 2002 WL 31412465, at *3 (S.D.N.Y. Oct. 24, 2002).

**I.    Actual Intent to Defraud**

The Bankruptcy Code allows a Trustee to avoid certain types of transfers made by the debtor prior to the bankruptcy filing in order to return assets to the estate for the benefit of its creditors. See Christy v. Alexander & Alexander of NY, Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52, 55 (2d Cir. 1997). The Trustee maintains that the transfers at issue here should be found to be fraudulent transfers. As the Bankruptcy Court explained below:

> Specifically, section 548 of the Bankruptcy Code provides for the avoidance of any transfer of an interest in property made by the debtor in the year prior to the filing of its bankruptcy petition as a fraudulent conveyance provided that the transfer was made with an actual fraudulent intent or with the badges of fraud constituting constructive fraud of the debtor's creditors.

In re Manhattan Fund Ltd., 359 B.R. at 516 (citing 11 U.S.C. § 548(A) and (B)). More specifically, section 548(a)(1), mandates that in order for a transfer to be avoided, it must be made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or

became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A).

In the decision below, the Bankruptcy Court held that the transfers at issue here fell squarely within the "actual fraud" provision because the Fund was a Ponzi scheme. In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme. See In re Manhattan Fund Ltd., 359 B.R. at 517 (citing Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995)). There is a general rule – known as the "Ponzi scheme presumption" – that such a scheme demonstrates "actual intent" as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." In re Manhattan Fund Ltd., 359 B.R. at 517-18; see also Drenis v. Haligiannis, 452 F. Supp. 2d 418, 429 (S.D.N.Y. 2006) (citing cases). The Bankruptcy Court found that the "Ponzi scheme presumption" applied in this case because Berger collected millions in new investments and reported

profits even as the Fund was losing huge amounts of money.[11]
The Bankruptcy Court also relied on the fact that Berger
pled guilty to securities fraud and on our earlier
description of the fraud as a "massive Ponzi scheme." <u>See</u>
<u>In re Manhattan Fund Ltd.</u>, 359 B.R. at 518.

Bear Stearns first argues that the transfers cannot be
fraudulent transfers because "they did not place assets
outside the reach of creditors." Def. Br. 44. Second,
Bear Stearns argues that the Bankruptcy Court erred by
applying the "Ponzi scheme presumption" as a matter of law.
Finally, Bear Stearns disputes that a Ponzi scheme existed
as a matter of fact. We discuss each of these arguments
<u>seriatim</u>.

### A.   Harm to the Fund's Creditors

In arguing that the transfers do not fall under
§ 548(a)(1)(A) because they did not remove assets from the
reach of creditors, Bear Stearns relies on our prior
decision in <u>Gredd I</u>, which addressed § 548(a)(1)(A) in the
context of Bear Stearns's motion to dismiss Counts II and
III of the complaint. In Count II, the Trustee sought to
avoid as fraudulent transfers the proceeds of the short

---

[11] The Bankruptcy Court noted that, for example, "[i]n 1998,
Berger collected nearly $200 million in investment principal,
lost more than $197 million in trading while claiming gains of
more than $33 million." <u>In re Manhattan Fund Ltd.</u>, 359 B.R. at
518 n.9.

13

sales of the securities which Bear Stearns loaned to the Fund and, in Count III, the Trustee sought to recoup as fraudulent transfers the amounts the Fund paid to Bear Stearns to repurchase the securities and close its positions. The issue presented in Gredd I was whether these funds constituted "an interest of the debtor in property" within the meaning of § 548(a)(1)(A). We concluded that a definition of property that "requires the fraudulent transfer to have actually harmed at least one creditor" best served the purpose of the Bankruptcy Code. Gredd I, 275 B.R. at 195. Thus, we concluded that "§ 548(a)(1)(A) only permits a trustee to avoid a transfer of an interest of the debtor in property when, but for the transfer, such property interest would have been available to at least one of debtor's creditors." Id. at 196. Applying these principles, we found the short-sale trading funds were never available to the Fund's creditors because of Regulation T, which required Bear Stearns to maintain the proceeds of the short sales on deposit in the short account at all times. Id. at 197-98 (noting that the Count II money "remain frozen and in the control of Bear Stearns so that it would be available to repay Bear Stearns's loan"). Here, Bear Stearns argues that: "Just as the securities and funds in Counts II and III cannot be

fraudulent transfers because they were never available for creditors, the funds in Count I (the Deposits) cannot be fraudulent transfers because they were equally available for creditors before and after they were made." Def. Br. 45 n. 121.

The facts do not support Bear Stearns's analogy: the funds at issue here were not "equally" available before and after each transfer. These transfers moved money from the Fund's account at the Bank of Bermuda to the margin account at Bear Stearns. Moreover, once the instant funds were transferred into the Bear Stearns account, the transfers were subject to numerous conditions that essentially wrested control of the money from the Fund, and by extension, its creditors. Bear Stearns had a security interest in the account's contents, Bear Stearns could prevent the Fund from withdrawing money as long as short positions were open, and Bear Stearns could actually use such monies to close out the Fund's short positions if it so decided. While the question of whether this gave Bear Stearns requisite control as an "initial transferee" is discussed infra, the powers vested in Bear Stearns through the account agreement clearly demonstrate that the Fund did not have access to its deposits once it placed them in the Bear Stearns account. Thus, Bear Stearns's (and the amici

<u>curiaes</u>') argument that the transfers did not remove assets from the reach of creditors must be rejected.

The accounts involved are analytically and practically distinct in another way as well. It is not the case here – as it was with the monies at issue in Counts II and III – that the monies were never available to the Fund's creditors. The monies sought in Count II were the deposited proceeds from the initial short sales of borrowed stock, and the monies sought in Count III were those proceeds plus other deposited funds that were eventually used to purchase the equivalent securities to close out the short positions.[12] In contrast, the transfers at issue here came entirely from the Fund's capital reserves (since Berger used new investments to support his short selling activities at Bear Stearns). Thus, the funds used in the transfers were the contributions of creditors and once a transfer occurred, those contributions were no longer accessible to the Fund. However, before each transfer, these funds were completely controlled by the Fund and

---

[12] Due to the maintenance margin requirements imposed on its account at Bear Stearns, the Fund was required to keep in the margin account an additional 35% of the proceeds of the short sales. Thus, the $1.9 billion sought in Count III consisted of the "frozen" proceeds from the short sales (the $1.7 billion that was the subject of Count II) plus amounts from the supporting margin account. <u>See</u> <u>Gredd I</u>, 275 B.R. at 197. None of this money was ever available to the Fund's creditors while short positions were open. <u>Id.</u>

therefore, prior to transfer, the money could have been available to creditors had bankruptcy been declared at that moment.

**B.   <u>Sharp</u> and the Ponzi Scheme Presumption**

Bear Stearns next argues that the Bankruptcy Court erroneously applied the "Ponzi scheme presumption" to this case. It claims that the recent decision in <u>In re Sharp International Corp.</u>, 403 F.3d 43 (2d Cir. 2005), "suggests" that the Ponzi scheme presumption no longer exists in this circuit. Def. Br. 45.

That case involved the systematic looting of a closely-held corporation, Sharp International Corp., by its managers. They falsified sales and invented customers in order to inflate the company's reported revenue and secure financing. Then they diverted these funds for their own purposes. <u>See</u> <u>id.</u> at 46-47. The defendants also made a loan repayment to a bank from which they had borrowed money before the fraud began. Sharp argued that the repayment was avoidable because the fraudulent scheme was clearly established – in other words, a strong presumption should apply. In the passage cited by Bear Stearns, the Second Circuit rejected this argument:

> Sharp argues that the district court
> inappropriately focused on the "badges of fraud"
> even though the [] fraud was so clearly

17

established that it need not be detected by indicia. However, the intentional fraudulent conveyance claims fails [sic] for the independent reason that Sharp inadequately alleges fraud with respect to the transaction that Sharp seeks to void.

Id. at 56. Bear Stearns interprets this holding as a rejection of the Ponzi scheme presumption because the Second Circuit did not accept Sharp's argument that a presumption of fraudulent intent should apply in that case.[13] This is a vast over-reading of the case. All the

---

[13] As background, it is important to explain the difference between "badges of fraud" and the Ponzi scheme presumption. As the Sharp Court noted:

> Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.

Id. (quoting Wall St. Assocs. v. Brodsky, 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 247 (1st Dep't 1999)). "Badges of fraud" do not create a presumption of fraudulent intent, however, but merely facilitate the analysis:

> The existence of a badge of fraud is merely circumstantial evidence and does not constitute conclusive proof of actual intent. However, the existence of several badges of fraud can constitute clear and convincing evidence of actual intent. While badges of fraud are not a prerequisite to a finding of actual fraudulent intent, their existence does help to focus the inquiry on the circumstances that suggest a conveyance was made with fraudulent intent, viz. with the purpose of placing a debtor's assets out of the reach of creditors.

In re Actrade Financial Techs. Ltd., 337 B.R. at 809.

In contrast, in the case of a Ponzi scheme, there is, as noted, a presumption of actual fraud: "[c]ourts have held that consideration of the badges of fraud is unnecessary where a

Circuit held was that Sharp had failed to establish that the challenged transaction – the repayment of an earlier loan – was fraudulent. This is clear for several reasons.

First, Sharp did not involve a Ponzi scheme and the court did not discuss the Ponzi scheme presumption. Therefore, there is no reason to ignore the long line of cases that support the presumption's continuing existence. See, e.g., Drenis v. Haligiannis, 452 F. Supp. 2d. 418, 429 (S.D.N.Y. 2006) (citing cases); Hayes v. Palm Seedlings Partners (In re Agricultural Research and Tech. Group, Inc.), 916 F.2d 528, 535 (9th Cir. 1990); Emerson v. Maples (In re Mark Benskin & Co., Inc.), 161 B.R. 644 (W.D. Tenn. 1993); Merrill v. Abbott (In re Independent Clearing House Co.), 77 B.R. 843 (D. Utah 1987).

Moreover, the transaction at issue in Sharp was different from the typical transaction in a Ponzi scheme. In Sharp, the transfer at issue was the repayment of a debt that was antecedent to the company's fraud. See id. at 55 (finding that "no ground exists therefore to 'collapse' that loan with other (non-contemporaneous) bad-faith

---

debtor was engaged in a Ponzi scheme." Securities Investor Protection Corp. v. Old Naples Securities, Inc. (In re Old Naples Securities, Inc.), 343 B.R. 310, 319 (M.D. Fla. 2006) (citing cases adopting the Ponzi scheme presumption).
    Thus, by arguing that the court need not rely on "badges of fraud" because the fraud was so obvious, the debtor in Sharp was asserting that something as forceful as the Ponzi scheme presumption should have applied.

maneuvers"). In contrast, in a Ponzi scheme, the transfers sought to be avoided occur as part of the fraud. They are not made to repay loans or services that preceded the fraud and were unrelated to it. For this reason, the transfer in Sharp is factually distinguishable from the typical transfers in a Ponzi scheme case.

The Second Circuit was also clear that it was dismissing the intentional fraudulent conveyance claims for a reason "independent" of Sharp's argument that a presumption should apply. Id. at 56. Thus, the court did not discuss whether such a presumption was appropriate as a general matter. Instead, it simply admonished that fraudulent intent must be alleged with respect to the specific transaction sought to be avoided. Id.; see also Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC), 362 B.R. 624, 637-38 (S.D.N.Y. 2007) ("[Sharp stands] for a central postulate in fraudulent conveyance analysis. That is, the Court must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of either an intentional or constructive fraudulent conveyance."). And since Sharp, courts have continued to apply the Ponzi

scheme presumption if the transfers at issue were related to a Ponzi scheme. See id. at 638.

Thus, Sharp does not dispose of the Ponzi scheme presumption. At most, it simply means that courts must be sure that the transfers sought to be avoided are related to the scheme. See id. ("[T]he Court of Appeals refused to attribute to Sharp's lawful repayment to [the bank] an 'actual intent to hinder, delay or defraud' based not on the lawful payment to [the bank], but upon a separate and different transaction, Sharp's fraudulent obtaining of funds from [other creditors]."). In reading Sharp too aggressively, Bear Stearns has conflated the question of whether the Ponzi scheme presumption remains viable with the question whether it should apply in this particular case.

### C. Application of the Ponzi Scheme Presumption

Having determined that the Ponzi scheme presumption remains the law of this Circuit, we now turn to the question of whether the transfers at issue were related to a Ponzi scheme, thereby triggering the application of the Ponzi scheme presumption and a finding of actual fraudulent intent. While we are cognizant of the possibility, as was the case in Sharp, that certain transfers may be so unrelated to a Ponzi scheme that the presumption should not

apply, we proceed under the rule (noted by the Bankruptcy Court below) that if a transfer serves to further a Ponzi scheme, then the presumption applies and "actual intent" under § 548(a)(1)(A) is present. See Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.), 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002)("Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay or defraud creditors, primarily the new investors.").

### 1. The Fund Was a Ponzi Scheme.

We have previously observed that "[t]his action arises out of a Ponzi scheme engineered by Michael Berger, the Fund's manager, who sought to cover losses from ill-advised short sales of technology stocks with deposits made by new investors." Gredd v. Bear, Stearns Securities Corp. (In re Manhattan Investment Fund Ltd.), 343 B.R. 63, 65 (S.D.N.Y. 2006). There is ample support in the record for this characterization. For example, the criminal information to which Berger pled guilty set forth that Berger continuously falsified the Fund's performance, sent account statements to current investors that reflected significant gains, concealed the Fund's true state from its auditors, and used his falsified records to attract new investors.

Nonetheless, Bear Stearns argues that summary judgment is inappropriate on this issue because the parties' experts disagree about whether this fact pattern fits neatly into the definition of a Ponzi scheme.  Not surprisingly, Bear Stearns argues for a restrictive definition of a Ponzi scheme, claiming that "a Ponzi scheme typically requires high promised returns or payment of 'artificially high dividends.'"  Def. Br. 49 n. 132.  But, as Bear Stearns's use of the qualifier "typically" shows, there is no precise definition of a Ponzi scheme and courts look for a general pattern, rather than specific requirements.  "[T]he label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud."  In re Bayou Group, LLC, 362 B.R. at 633; see also Ades-Berg Investors v. Breeden (In re The Bennett Funding Group, Inc.), 439 F.3d 155, 157 n.2 (2d Cir. 2006).  A key factor is that the Ponzi schemer requires – and secures – new investors to keep the sham arrangement afloat.  That was the case here: starting in 1996, Berger collected over $575 million in investments.[14]  Another factor is that new

---

[14] Berger collected nearly $200 million in new investments in 1998 alone.

monies are used to pay off earlier investors. We know from the Fund's records and Bear Stearns's own discussions with EIM, that at least some investors redeemed their stake in the Fund in the year before the Fund's collapse.[15] See Def. Br. 36 n. 97. Further, since the Fund was losing enormous amounts of money, any redemption payments must have come from the new capital infusions. Thus, at least two hallmarks of a Ponzi scheme are clearly present.

Bear Stearns argues that the Fund was not a Ponzi scheme because Berger did not promise extraordinarily high returns. This argument likewise does not survive scrutiny. While Berger may not have made literal promises, such "you will make 'X' percent on your investment," Berger attracted investors by representing that the Fund was performing exceedingly well. For example, in a 1999 confidential offering memo, he displayed a 27.4% return for 1997 and a 12.4% return for 1998. Adding all the reported gains together, Berger pretended that the Fund had grown over 60% since its inception in 1996. This was a clear enticement to investors. Such representations are consistent with the

---

[15] The Trustee's expert also asserts that Berger was using new investments to pay off earlier investors throughout the relevant time period. Bear Stearns does not dispute this.

existence of a Ponzi scheme.  Thus, summary judgment is appropriate on this question.[16]

## 2.   The Transfers Furthered the Ponzi Scheme.

Having determined that the Fund was a Ponzi scheme, we turn to the transfers at issue in order to decide whether

---

[16] To avoid this finding, Bear Stearns further argues that "the Deposits were made with the intent to make money for investors by engaging in the Fund's disclosed strategy of short selling."  Def. Br. 43.  This argument is wholly unconvincing. Whatever may have Berger's intent at the outset, by the time of the events at issue here, Berger's fraud was a full blown Ponzi scheme.  The Ponzi scheme presumption is based on the theory that a Ponzi schemer "must have known that undertakers at the end of the line would lose their money."  In re Independent Clearing House Co., 77 B.R. at 860.  As In re Independent Clearing House Co. – a seminal Ponzi scheme presumption case – explained:

> One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, cf. Restatement (Second) of Torts § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.

Id.; cf. Shapiro v. Wilgus, 287 U.S. 348, 354 (1932) ("Many an embarrassed debtor holds the genuine belief that if suits can be staved off for a season, he will weather a financial storm, and pay his debts in full.  The belief, even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay.")  In short, Berger's purported state of mind is irrelevant to the Ponzi scheme inquiry.  The Ponzi scheme presumption is an objective test.

they were made "in furtherance" of the fraud.  In re World

Vision Entm't, 275 B.R. at 656.  While perhaps not as

clearly tainted as payments from a Ponzi schemer to an

individual to reward them for locating new investors,[17] the

payments here were essential to the continuation of the

scheme.  First, to the extent the transfers were made to

open new trading positions, they were part of the overall

scheme – one which, by December 1998, had been fraudulent

for years.  Second, to the extent the transfers were made

to support open positions, they are also clearly part of

the Ponzi scheme.  Because the Fund's only strategy was to

short-sell technology stocks, it had to keep its account at

Bear Stearns operational in order to survive.  If it had

not made the transfers into the margin account,[18] the Fund

could have collapsed almost immediately because Bear

Stearns could have closed out its short positions and used

the money already in the account to cover its own

_____

[17] See In re World Vision Entm't, 275 B.R. at 657.

[18] Bear Stearns also takes issue with the Bankruptcy Court's
characterization of the transfers as "margin payments" and argues
that this would "eviscerate" the "stockbroker defense" under
§ 546(e).  Def. Br. 47-48; see also In re Manhattan Fund, 359
B.R. at 516 (explaining that § 546(e) prevents the avoidance of
margin payments unless there is actual fraud).  But, § 546(e)
does not preclude avoidance if there is actual fraud under
§ 548(a)(1)(A), which is the provision from which the Ponzi
scheme presumption is derived.  Thus, even if the transfers were
margin payments, the application of the Ponzi scheme presumption
does no harm to § 546(e).

liabilities. Given this undisputed record, we conclude that the transfers were "in furtherance" of the Ponzi scheme and trigger the Ponzi scheme presumption. Thus, we affirm the Bankruptcy Court's finding that actual fraud existed as a matter of law under § 548(a)(1)(A).[19]

## II. Initial Transferee

We next decide whether Bear Stearns was an "initial transferee" under § 550(a) of the Bankruptcy Code.[20] 11 U.S.C. § 550(a). If it was, then the Trustee may recover the transfers unless Bear Stearns can establish that it accepted them in good faith. 11 U.S.C. § 548(c).

The Bankruptcy Court held that Bear Stearns was an "initial transferee" because it "had the ability to exercise control and use the Transfers to protect its own

---

[19] We note that our finding of actual fraud on the part of Berger does not suggest that Bear Stearns acted fraudulently or aided and abetted Berger, which the <u>Cromer</u> Court held it did not.

[20] Section 550(a) of Title 11 of United States Code provides:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> > (2) any immediate or mediate transferee of such initial transferee.

economic well-being." <u>In re Manhattan Fund</u>, 359 B.R. at 522. Bear Stearns argues that this holding was in error because the Bankruptcy Court (1) did not apply the precise legal test; (2) failed to properly apply the test; and (3) ignored important policy consequences of its decision.

### A. The Mere Conduit and Dominion and Control Doctrines

The Bankruptcy Code does not define the terms "transferee" or "initial transferee" and there is no helpful legislative history. <u>See</u> <u>Bonded Fin. Svcs. v. European Am. Bank</u>, 838 F.2d 890, 893 (7th Cir. 1988). Courts across the country have been left to grapple with the term's meaning and have devised differing variations of the same basic test.

The Seventh Circuit's <u>Bonded</u> decision is the preeminent initial transferee case. In that case, a currency exchange gave $200,000 to its principal, Michael Ryan, by sending the bank a check with a note to deposit the check into Ryan's account. <u>Bonded</u>, 838 F.2d at 891. The court ruled that the bank was not the initial transferee because it acted as a "financial intermediary" and "received no benefit." <u>Id.</u> at 893. The court explained:

> we think the minimum requirement of status
> as a "transferee" is dominion over the money

> or other asset, the right to put the money
> to one's own purposes. When A gives a check
> to B as agent for C, then C is the "initial
> transferee"; the agent can be disregarded.

Id. The court elaborated that "an entity does not have legal dominion over the money until it is free to invest that money in lottery tickets or uranium stocks." Id. at 894. This holding established the "dominion and control test," which has been adopted in various iterations by the circuits.

In Christy v. Alexander & Alexander of New York (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52 (2d Cir. 1997), the Second Circuit adopted what it called the "mere conduit test." Id. at 58. This construct frames Bonded's "dominion and control" test in the negative.[21] Rather than stating that a party is an initial transferee if it exercises "dominion and control" over the funds, the Second Circuit's version of the test states that a party is not an initial transferee if it was a "mere conduit" of the funds. See Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Investments, Inc.), 155 B.R. 332, 337 (Bankr. S.D.N.Y. 1993)("Parties that act as conduits and simply facilitate

---

[21] The "mere conduit" rule is also often referred to as an exception or a defense to the "dominion and control" test. See Poonja v. Charles Schwab & Co., Inc. (In re Dominion Corp.), 199 B.R. 410, 413 (B.A.P. 9th Cir. 1996).

the transfer of funds or property from the debtor to a third party generally are not deemed initial transferees . . . .") (<u>quoted</u> <u>in</u> <u>In re Finley</u>, 130 F.3d at 58 n.3).

This phrasing of the test envisions that there are three relevant parties: the transferor, the conduit, and a third party who receives the transferred funds from the conduit. However, because there will not always be three relevant parties, the "mere conduit" test can misdirect the analysis in some contexts. This case is such an example. Here, the money did not flow from the Fund through Bear Stearns to a third party as in <u>Bonded</u> or <u>In re Finley</u>; rather, it was lost to the market through the Fund's trading. Thus, viewing this case simply through the lens of the typical conduit situation will not suffice.

Because <u>In re Finley</u> analyzed <u>Bonded</u> and approved of its reasoning, the "dominion and control" test as stated in <u>Bonded</u> is also an essential part of the "initial transferee" inquiry in this Circuit. In other words, just because a party is not a "mere conduit" in the prototypical sense of the term – <u>i.e.</u>, a party that receives the money merely to pass it on to a third-party – does not mean that the party has requisite "dominion and control" over the funds. <u>See</u> <u>Bonded</u>, 838 F.2d at 891. Thus, <u>In re Finley</u>

established the combined rule that an initial transferee must exercise dominion over the funds at issue and be able to put them to "his own purposes" even if it is not a "mere conduit" in the standard sense of the term. See Bonded, 838 F.2d at 891.

### 1. Bear Stearns's Proposal

Before proceeding to this analysis, however, we discuss Bear Stearns's position that a narrower test is appropriate. Relying on Universal Service Administrative Co. v. Post-Confirmation Committee of Unsecured Creditors (In re Incomnet, Inc.), 463 F.3d 1064 (9th Cir. 2006), Bear Stearns contends that two separate and competing tests emerged after Bonded. See Def. Br. 23-24. In In re Incomnet, the Ninth Circuit explained that one version of the Bonded test is the "dominion test" and the other version is the "control test."[22] The "dominion test" is

---

[22] Bear Stearns associates the "dominion test" with Bonded itself. This results from the fact that before Bonded, courts frequently found the first recipient of a transfer to be an "initial transferees" under the plain language of statute but used equitable considerations to avoid the harsh results of such a simple approach. See Bonded, 838 F.2d at 894. Bonded rejected that approach and attempted to restrict the meaning of the term so that courts would not need to rely on their equitable powers to avoid imposing sweeping liability on agents, couriers, and the like. Therefore, the court stated that "initial transferee" "must mean something different from 'possessor' or 'holder' or 'agent.'" Id. at 893. The ability to use the money "for one's own purposes" was key. In this way, the "dominion test" can be seen as technical.

arguably more restrictive and "focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit." _Incomnet_, 463 F.3d at 1071. Strictly construed, this test favors Bear Stearns because it suggests that, as long as Bear Stearns was not free to buy "lottery tickets or uranium stocks," it was not an initial transferee of the Fund's money.

We refuse to apply the "dominion test" in its strictest form as presented by Bear Stearns. While _In re Finley_'s "mere conduit" test incorporates aspects of the dominion test,[23] it does not follow that our analysis should be guided by "the Seventh Circuit's colorful phrase" about lottery tickets and uranium stocks. _Id._ at 1074. The real inquiry is more nuanced.

---

In contrast, the "control test" "takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question." _In re Incomnet, Inc._, 463 F.3d at 1071. In other words, the test is reminiscent of the pre-_Bonded_ regime because it allows courts to continue to infuse the test with equitable considerations. For example, the Eleventh Circuit explained that it allows for a "very flexible [and] pragmatic" analysis by "require[ing] courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." _Nordberg v. Societe Generale (In re Chase & Sandborn Corp.)_, 848 F.2d 1196, 1199 (11th Cir. 1988).

[23] The Ninth Circuit has posited that, in _In re Finley_, the Second Circuit adopted a combined version of the two tests outlined above at _supra_ n.22. _In re Incomnet_, 463 F.3d at 1071.

**B.  Application of the _In re Finley_ Test**

The Bankruptcy Court relied heavily on the "mere conduit" concept as articulated by the Second Circuit in _In re Finley_.  It found that Bear Stearns was an initial transferee because its position was readily distinguishable from other entities that have been held to be "mere conduits":

> In most cases, the recipient was held to be a mere conduit primarily because it did not receive consideration or compensation for its services nor did it have any liability in the transaction as a whole if the transfers had been made to the recipient.

_In re Manhattan Fund_, 359 B.R. at 521.  The Bankruptcy Court based its conclusion on the fact that Bear Stearns received a commission on the transfers, was liable for the Fund's open positions, and used the transfers to cover those positions.  _Id._ at 521-22.  The key factor to the Bankruptcy Court was that Bear Stearns held the transfers for its own protection.  _Id._ at 522.  Thus, while it referenced the "mere conduit" rubric, the Bankruptcy Court implicitly found that Bear Stearns exhibited a degree of dominion and control over the funds that amounted to the ability to "put the money to [its] own purposes."  _Bonded_, 838 F.2d at 893.

Bear Stearns advances numerous arguments against this conclusion. For its part, the Trustee complains that Bear Stearns arguments seek to fundamentally alter the Bankruptcy Code. While not necessarily welcomed, the parties' rhetoric is perhaps understandable because this case does not easily fit fully within either the "mere conduit" or "dominion and control" prototypes.[24] We examine (1) whether Bear Stearns can be considered a "mere conduit" and (2) if it cannot, whether it was able to use the Fund's deposits for its own purposes.

### 1. Bear Stearns Was Not a Mere Conduit.

We begin by expressing our concurrence with the Bankruptcy Court's finding that Bear Stearns was not a "mere conduit." Bear Stearns asserts that, as a general rule, financial institutions are mere conduits of their customer's deposits. It compares itself to the numerous

---

[24] Consistent with the framework outlined above, two clearly delineated categories of "initial transferee" cases have emerged. 5 Collier on Bankruptcy § 550.02[4][a] (15th ed. 2007). In one line of cases, the recipient of funds is not deemed to be an initial transferee because it simply acts as an uninterested agent between the transferor and another entity – these are the "mere conduit" cases. See, e.g., In re Finley, 130 F.3d at 59; In re Chase & Sandborn Corp., 848 F.2d at 1200; Bonded, 838 F.2d at 893. In the other, the recipient is deemed to be an initial transferee because it obtains a complete ability to do what it wishes with the funds – these are the dominion and control cases. See, e.g., Taunt v. Hurtado (In re Jon Rey Hurtado), 342 F.3d 528, 535 (6th Cir. 2003) (holding a party to be an initial transferee because she was given legal title to the funds).

banks, couriers, and escrow agents that have been held to
not be initial transferees.  Bear Stearns acknowledges,
however, that in these cases, the conduits held the funds
for the benefit of another and served at their behest.  See
Def. Br. at 13 n.48 (citing Leonard v. First Commercial
Mortgage Co. (In re Circuit Alliance), 228 B.R. 225, 233
(Bankr. D. Minn. 1998)(noting that mere conduits hold
transfers "only in the status of commercial or professional
intermediaries for the parties that actually hold or
receive a legal right, title, or interest").  Similarly, in
In re Finley, an insurance broker was held not to be an
initial transferee because it simply transferred premiums
from a customer to an insurance company "but had no
discretion to do anything else."  130 F.3d at 59; see also
Bonded, 838 F.2d at 893 (stating that a mere conduit holds
funds "only for the purpose of fulfilling an instruction to
make the funds available to someone else").

The relationship between the parties in In re Finley,
Bonded, and the other "mere conduit" cases is readily
distinguishable from the relationship between the Fund and
Bear Stearns.  The transfers here did not go from the
Fund's bank account to the account at Bear Stearns in order
to be transferred to a third party.  As noted, there is no

identifiable third party in this case.[25] The transfers are thus properly viewed as either benefiting the Fund or benefiting Bear Stearns. In either case, reliance by Bear Stearns on the mere conduit concept is unavailing.

More importantly, once the funds were deposited, and as long as short positions were open, Bear Stearns did not have to respond to directions from the Fund. Indeed, so long as there were open short positions, Bear Stearns was not required to return the money to the Fund and was also able to initiate affirmative measures with respect to the funds. Thus, Bear Stearns's position is simply not parallel to the traditional bank cases.[26] See Malloy v. Citizens Bank of Sapulpa (In re First Security Mortgage Co.), 33 F.3d 42, 43 (10th Cir. 1994)(holding that bank was not an initial transferee where transferor "exercised complete discretion regarding deposits to and disbursements from the account, and he was entitled to possession of all

---

[25] It could be posited that the third party was the stock market in general because the transfers were used to support trades Bear Stearns was making on behalf of the Fund. However, this focuses on the relationship between Bear Stearns and the Fund at too high a level of generality. We must "examine the transfers themselves," In re Finley, 130 F.3d at 59, which Bear Stearns required to ensure that it did not lose money due to its role as prime broker. See infra II.B.2.

[26] Bear Stearns's emphasis that the transfers were put into the Fund's "own account" does not help. Def. Br. 15. The ability to use the money in an account – not the name given to that account – is the crucial question to be decided.

account funds upon demand"); <u>see also</u> <u>In re Chase &</u>
<u>Sanborn</u>, 848 F.2d at 1201 (finding a bank to be a mere
conduit because it credited a customer's account with funds
"expressly earmarked for that purpose")(quotation marks and
citation omitted). For these reasons, Bear Stearns was not
a "mere conduit."

> **2. Bear Stearns Had Dominion and Control Over the Transfers.**

While Bear Stearns was not a "mere conduit," the
question of whether Bear Stearns had "dominion and control"
over the transferred funds so as to result in transferee
liability remains and is more challenging. The account
agreement clearly gave Bear Stearns rights to use the funds
to protect itself. On the other hand, Bear Stearns did not
have the type of "unfettered control" that would be present
in the simplest of fraudulent conveyance cases.
Conceptually, then, this case is difficult because Bear
Stearns was not able to use the transfers to make a
separate <u>profit</u>.

To support its position that it did not have "dominion
and control," Bear Stearns minimizes the extent of the
actual control it had over the funds and emphasizes that it
did not have "unfettered control." Bear Stearns relies
heavily on SEC Rule 15c3-3(e)(2), which precludes a

securities broker from using customer funds in its own investing or for its "proprietary" purposes,[27] to argue that it did not have "legal" dominion and control over the transfers. Def. Br. 17. According to Bear Stearns:

> the controlling question is whether Bear Stearns could have legally used the Deposits for Bear Stearns's own purposes such that Bear Stearns could have, in essence, purchased lottery tickets or uranium stocks for its own account with the Deposits at the time they were made into the Fund's account.

Id. at 19. While we agree that Bear Stearns was not free to use the transfers to buy "lottery tickets or uranium stocks," we reject the suggestion that the "dominion and control" test formally incorporates Judge Easterbrook's dicta.

Other courts have rejected similar arguments. The In re Incomnet Court explained that "the fact that [the recipient] can only spend the [funds] in accordance with

---

[27] SEC Rule 15c3-3(e)(2) provides:

> It shall be unlawful for any broker or dealer to accepts or use any of the amounts under items comprising Total Credits under the formula referred to in paragraph (e)(1) of this section except for the specified purpose indicated under items comprising Total Debits under the formula, and, to the extent Total Credits exceed Total Debits, at least the net amount thereof shall be maintained in the Reserve Bank Account pursuant to paragraph (e)(1) of this section.

17 C.F.R. § 240.15c3-3(e)(2). There is no dispute that the funds in the Fund's margin account at Bear Stearns are covered by this provision.

certain federal regulations does not necessarily mean it is not a transferee." 463 F.3d at 1074 (noting "it is no consequence that the recipient cannot invest funds in . . . 'lottery tickets or uranium stocks'"). <u>Lowry v. Security Pacific Business Credit, Inc. (In re Columbia Data Products, Inc.)</u>, 892 F.2d 26 (4th Cir. 1989), also rejected the notion that complete "unfettered control" was needed for transferee liability. In that case, a company called Logan had borrowed money from a bank. Logan was the creditor of another company, CDP, which before it went bankrupt, distributed money to Logan, who, pursuant to an agreement with the bank, placed the money in an account set up for the purpose of repaying the loan. <u>See</u> <u>id.</u> at 27. The Fourth Circuit found that the bank that received the funds was not an initial transferee. Instead, Logan was viewed as the transferee because it "used the funds for its own purpose – to reduce its debt to [the bank]. The fact that Logan could not have used the funds for other purposes does not affect this critical factor." <u>Id.</u> at 29. Thus, <u>Lowry</u> stands for the proposition that a party can be an initial transferee even if it cannot use received funds for endeavors unrelated to the underlying transaction. For this reason, Bear Stearns's reliance of SEC Rule 15c3-3(e)(2) is not persuasive.

Lowry's emphasis on the fact that the transferee Logan used the money for "its own purpose" is of importance here. Here, the transfers ensured that Bear Stearns would not suffer any losses due to its stock loans to the Fund. Bear Stearns's effort to suggest that the Bankruptcy Court was incorrect in concluding that the account agreement gave Bear Stearns "'the ability to exercise control and use the Transfers to protect its own economic well-being' . . . because the agreement gave Bear Stearns the ability to ensure that the Fund met the Fund's obligations with the Fund's money" is simply disingenuous. Def. Br. 18 (quoting In Re Manhattan Fund, 359 B.R. at 522). The fact is that Bear Stearns was responsible for the stock it purchased at the Fund's direction. The ability of Bear Stearns to look to the transferred funds was no "incidental economic protection." Def. Br. 18. As the Bankruptcy Court properly emphasized, Bear Stearns had the right to use the funds to shut down any of the Fund's short positions without its permission. Bear Stearns was also able to prevent the Fund from withdrawing any money from the account if there were open short positions. The agreement between Bear Stearns and the Fund reflects that the parties were in a debtor-creditor relationship. Although the purpose of the transfers was not to repay a loan per se,

the transfers ensured that Bear Stearns would never be in a position to need repayment. Creditors receiving loan payments are frequently deemed to be initial transferees. See Golden v. The Guardian (In re Lenox Healthcare, Inc.), 343 B.R. 96, 105 (Bankr. D. Del. 2006); Official Comm. of Unsecured Creditors of 360networks (USA) v. U.S. Relocation Services (In re 360networks (USA) Inc.), 338 B.R. 194, 203 (Bankr. S.D.N.Y. 2005); Meininger v. TMG Staffing Servs., Inc. (In re Cypress Restaurants of Ga.), 332 B.R. 60, 65 (Bankr. M.D. Fla. 2005); see also Bonded, 838 F.2d at 894 (finding the bank to have dominion over the funds when, 10 days after the initial transfer, the debtor transferred them to the bank to reduce an existing loan). Here, the transfers were made for a similar purpose. It is clear, then, that the transfers were held for Bear Stearns's "own purposes."

### (a) Stockbroker Cases

Bear Stearns relies on two cases involving stockbrokers as support for its claim that the account agreement provided it only "with incidental economic protection." Def. Br. 18. As will be demonstrated, this argument is factually flawed. It is also without case support. The two stockbroker cases are best characterized as "mere conduit" situations as the brokers had no ability

to control the funds that they were passing from one entity to the next.

In Kaiser Steel Resources, Inc. v. Jacobs (In re Kaiser Steel Corp.), 110 B.R. 514 (D. Colo. 1990), two companies merged as part of a leveraged buyout and Charles Schwab & Co., Inc. redeemed stock on behalf of certain of its customers. Schwab used other intermediaries to exchange the stock for cash, which eventually passed through a Schwab account to its customers' accounts. See id. at 517. Under SEC Rule 15c3-3(e)(2), Schwab had no ability to use the money for itself but the money that passed through its account was subject to a lien "for the discharge of any customer indebtedness to Schwab." Id. Bear Stearns argues that the shared features of the interactions in this case and those in In re Kaiser make it a neutral intermediary just like Schwab.

However, a closer examination of the facts demonstrates that Bear Stearns's reliance is misplaced. First, the In re Kaiser Court pointed out that Schwab "had no ability to control the disposition of funds paid to its customers in the merger. It was simply a financial intermediary . . . ." Id. at 521 (emphasis added). In contrast, Bear Stearns indisputably could make various decisions about the transferred funds once they were in the

42

Fund's account.  Bear Stearns was no mere pass through entity.

Second, in _Kaiser_, Schwab received no benefit from redeeming the stock for its customers.  See _id._ (noting that Schwab "never held a beneficial interest in any Kaiser stock [and] received no consideration for facilitating the conversion of its customers' stock. . . .").  Here, on the other hand, Bear Stearns received $2.4 million in commissions during the relevant time period.

Finally, we acknowledge that the _Kaiser_ Court did not find Schwab's lien to support transfer liability.  However, we find the lien in this case to be significantly different.  In _Kaiser_, the lien existed independent of the stock redemption function Schwab carried out for its customers.  See _id._ (noting that the lien existed "only to secure amounts due Schwab," of which there were none).  Moreover, it was never implicated because Schwab never assumed any risk when it transferred the proceeds from the stock sale to its customers.  In contrast, Bear Stearns did incur risk in order to support the Fund's short selling and the lien was part of the arsenal of remedies it possessed to ensure that this risk did not result in a loss to Bear Stearns.  For these reasons, _In re Kaiser_ is not on point with the facts in this case.

43

Bear Stearns also relies on Poonja v. Charles Schwab & Co., Inc. (In re Dominion Corp.), 199 B.R. 410 (B.A.P. 9th Cir. 1996), to argue that it is like other securities brokers that have been held not to be "initial transferees." In that case, Schwab had a relationship with Visa, Bank of America, and others that allowed customers to use a debit card that was linked to their brokerage account at Schwab. Id. at 411. After Bank of America processed credit card purchases, Schwab would automatically debit the customer accounts. See id. Because of the automatic nature of the transactions – which was designed to "avoid placing Schwab in a creditor position" – Schwab was deemed a mere conduit. Id. at 415. Bear Stearns claims that, like Schwab, it received the transfers "on behalf of the Fund." Def. Br. 23. But, unlike Schwab, the transfers at issue here did not occur automatically; nor did Bear Stearns process them automatically. It closely monitored the Fund's positions and was able to adjust the margin requirements, thereby causing further infusions from the Fund. And, once the transfers were made, Bear Stearns could have instantly used the monies to close out the Fund's short positions. In In re Dominion Corp., Schwab did not have any similar powers.[28]

---

[28] Schwab also had a lien on the account funds but the court

Thus, Bear Stearns's effort to paint itself as merely a provider of "back office" services fails. The "initial transferee" inquiry in this case does not depend on the fact that Bear Stearns supported the Fund's trading – their general relationship is not the key. Rather, the pivotal factor is that, once the funds were transferred into the margin account, Bear Stearns was able to keep the funds and use them to protect itself against possible liability that could arise from the Fund's risky trading activity.

### (b) Bear Stearns's Discretion With Respect to the Funds

Even assuming that Bear Stearns's control of the transferred funds was merely "incidental" to its economic well-being, the degree of decision-making authority Bear Stearns possessed with respect to the funds demonstrates a level of "dominion and control" sufficient to create transferee liability. Two cases involving similar levels of control – and in which the defendant did not personally profit from its use of the funds – illustrate the difference between the role of Bear Stearns and the roles of Schwab in the cases relied on so heavily by Bear Stearns. In a case cited by the Bankruptcy Court, <u>Morris</u>

---

found that because it "came into play only once, [it] is not pertinent to review." <u>Id.</u> at 414.

v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.), 321 B.R. 388 (Bankr. D. Del. 2005), a travel agency that received payments from a debtor for services it had arranged to be provided by third parties was held to be an initial transferee. Even though much of the money was used to pay the third parties, the travel agency was held to be an initial transferee because it "had the power to decide who to pay with the funds received." Id. at 396. The ability to "control and direct resources" was the hallmark of dominion and control. Id. Similarly, in In re Jon Rey Hurtado, the Sixth Circuit held a mother who received funds from her son prior to his bankruptcy to be an initial transferee. Although she did not use the money for herself but rather doled out the funds to her son on a monthly basis, she was liable because she had the power to give him the money or not. See In re Jon Rey Hurtado, 342 F.3d at 534. Again, this "ability" was the major factor underlying the court's decision. See id. ("The fact that she did not choose to use the funds [for her own benefit] in no way undercuts the fact that she had that ability.").

As in In re U.S. Interactive, Inc. and In re Jon Rey Hurtado, in this case, when short positions were open (which was the case during the relevant time period), the ability to "control and direct" the transfers rested solely

46

with Bear Stearns. Even though the Fund's balance in its margin account was higher than Bear Stearns's minimum maintenance margin threshold during part of the relevant time-period, all of the money was subject to the same powers. Most importantly, Bear Stearns could use the funds to close out the Fund's short positions at any time. This powerful discretion gave Bear Stearns "dominion and control" over the transfers. Moreover, in the end, Bear Stearns did in fact decide to use the money to cover certain of the Fund's positions, further cementing its initial transferee status.[29] Thus, the Bankruptcy Court properly found Bear Stearns to be an "initial transferee" under § 550(a).

### C. Bear Stearns's and the <u>Amici</u> <u>Curiae</u>'s Policy Concerns

Before turning to the good faith defense, we address Bear Stearns's expressed policy arguments joined by three amici[30] to the effect that finding transferee liability on the basis of the account agreement, which they hold out as standard for the industry, would negatively impact the

---

[29] As noted, Bear Stearns even had to power to increase the flow of transfers into the account by making margin calls to the Fund, which it did on a regular basis in the end of 1999.

[30] We received amicus curiae briefs from the International Swaps and Derivatives Association, Inc. and the Financial Markets Lawyers Group (jointly) and the Securities Industry and Financial Markets Association.

securities trading industry by making prime brokers less willing to "stand behind" short sales and thus impeding the efficient functioning of the securities markets.  Def. Br. 26 (citing Gredd I, 275 B.R. at 198).

We do not share the same fears.  We do not dispute – and indeed, we so noted in Gredd I – that provisions in the Bankruptcy Code are intended to facilitate the smooth operation of the securities markets.  However we are unaware of any authority that relieves prime brokers from potential transferee liability.  As the Trustee correctly points out, the Code does not grant complete immunity for brokers.  If actual fraud is found, Congress specifically provided that the "stockbroker exception" does not apply to margin payments or similar transfers.[31]

---

[31] The Bankruptcy Court found the transfers to be margin payments under the Bankruptcy Code.  Although the parties agree that it is not "technically relevant" to the initial transferee analysis, they dispute whether this characterization has policy implications for this case.  The Bankruptcy Court discussed the transfers as "margin payments" in order to support its discussion of § 546(e), which is known as the "stockbroker defense" and "prevents a trustee from avoiding margin payments made to a stockbroker except where there is actual fraud."  In re Manhattan Fund, 359 B.R. at 516 (emphasis added).  The Bankruptcy Court alluded to this section in order to show that, in cases of actual fraud, payments to stockbrokers are not protected.  See id. at 522.  In its brief on appeal, the Trustee argues that this reasoning correctly shows that prime brokers are not subject to complete immunity.  Bear Stearns attempts to diminish this point by arguing that the transfers were not margin payments (and therefore should not be considered under the rubric of § 546(e)).
      While we need not decide whether the Bankruptcy Court was correct in characterizing the transfers as "margin payments," we find nothing wrong with the Bankruptcy Court's consideration of

Moreover, should this opinion withstand an appellate challenge, we have little doubt that counsel advising prime brokers such as Bear Stearns have the capacity to redraft the standard industry account agreement to avoid the result if it would be in their clients' considered economic interest to do so.[32] Obviously, relinquishing "dominion and control" increases the risk of adverse consequences to prime brokers.

Finally, we note that even if all prime brokers could somehow be considered "initial transferees," they still possess a robust "good faith" defense to avoid liability. We next consider the application of this defense in this case.

## III. Good Faith

Despite Bear Stearns's status as an initial transferee, the Trustee is not entitled to recover the transfers if Bear Stearns can establish that it accepted the funds in good faith. Section 548(c) of the Bankruptcy Code provides that, even if a transfer is voidable, "a

---

§ 546(e) in its policy discussion. Because of the absence of helpful legislative history about § 550(a), looking to Congress's balancing analysis for broker liability in other code sections is a valid method for distilling the policy purposes of § 550(a).

[32] For example, it is not clear that, in order to provide its services, a prime broker must have the unilateral authority to close out a hedge fund's positions or to control funds in excess of the maintenance margin requirements.

transferee that takes for value and in good faith may retain any interest transferred to the extent that such transferee gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c). Bear Stearns has the burden of proving its good faith. See In re Actrade Fin. Tech. Ltd., 337 at 791. While there is no dispute that Bear Stearns took the transfers for value, the parties dispute whether questions of fact remain with respect to the remainder of the analysis.

The Bankruptcy Court correctly noted that the good faith question can be broken down into two parts: (1) whether Bear Stearns was on inquiry notice of the Fund's fraud and (2) whether Bear Stearns was diligent in its investigation of the Fund.[33] See In re Manhattan Fund, 359 B.R. at 524-25 (citing Hayes v. Palm Seedlings Partners (In re Agric. Research and Tech. Group, Inc.), 916 F.2d 528, 535-36 (9th Cir. 1990)). An objective standard applies to both questions. See id. Thus, we consider whether what Bear Stearns knew or should have known triggered a duty to investigate further and whether its investigation was reasonable under the circumstances.

---

[33] The parties also accept this framework, although Bear Stearns asserts a reservation to argue that a standard of actual knowledge should govern.

## A.   Inquiry Notice

First, we affirm the Bankruptcy Court's ruling that Bear Stearns was put on inquiry notice of the Fund's fraud. The Bankruptcy Court found that Bear Stearns was on notice beginning in December 1998 when Fredrick Schilling, a Bear Stearns Senior Managing Director, learned of the Fund's reported performance at a cocktail party, which differed markedly from his understanding.  We agree with Bear Stearns that this much ballyhooed conversation did not instantly put it on inquiry notice.  However, this is not what the Bankruptcy Court held.  Rather, the Bankruptcy Court focused on what Bear Stearns learned <u>after</u> Schilling heard information about the Fund that did not "sound right."  Appx. to Pl. Br. A699 (Dep. of Fredrik Schilling).

The issue presented is whether the information Bear Stearns learned would have caused a reasonable prime broker in its position "to investigate the matter further." <u>Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 89 Fed. Appx. 287, 291 (2nd Cir. 2004).  But Bear Stearns does not claim that it had no reason to investigate the Fund.  Instead, it argues that its lack of actual knowledge of Berger's fraud indicates that it was not on inquiry notice.  Def. Br. 33.  This reliance on actual knowledge misconstrues the inquiry notice standard.

Determining what Bear Stearns knew is not the same as asking whether Bear Stearns should have attempted to learn more.

In this case, the best evidence of what a prudent prime broker would have done is what Bear Stearns actually did. In other words, the support for a finding of inquiry notice is found in Bear Stearns's own reaction: the actions it took in the year between December 1998 and December 1999 clearly show that it had cause to and did investigate further.

Even drawing all inferences in Bear Stearns favor, Bear Stearns was on inquiry notice beginning the day after the cocktail party. The information that Bear Stearns learned in the aftermath of Schilling's social outing put Bear Stearns on alert that there was a potential problem with the Fund. Schilling spoke with his source's superior, who asked whether the Fund's performance matched Bear Stearns's records.[34] Schilling then met with various Bear Stearns executives and confirmed that the Fund was losing money. Thus, Bear Stearns discovered a worrisome discrepancy between what it knew about the Fund's

---

[34] Schilling did not divulge this information but directed the caller, Arpad Busson of EIM, to make a written request to Bear Stearns.

performance and the Fund's 20% reported profit.  Appx. to Def. Br. A970-71 (Dep. of Fredrik Schilling).

Prudently, Bear Stearns investigated further.  Worried about the discrepancy, Schilling and other executives arranged a conference call with the Fund's introducing broker (Financial Asset Management) and Berger himself.  In that call, Berger explained that Bear Stearns "did not have a complete picture of the Fund's assets" because he was using eight or nine other prime brokers.  Id. at A969-70 Although Bear Stearns now claims that this response "fully explained" what Schilling had heard and confirmed, Bear Stearns continued its investigation.  Def. Br. 34. Schilling even took the step of contacting the Fund's auditor, Deloitte & Touche, to urge caution in its upcoming audit.[35]  According to Schilling, he made this call because, unlike Bear Stearns, Deloitte was in a position to verify Berger's explanation.  However, Schilling did not receive verification from Deloitte as to whether the Fund was using multiple prime brokers.

In February of 1999, Schilling ran into Busson (of EIM) at a conference in Switzerland.  Schilling inquired

---

[35] Although Bear Stearns asserts that this call was made merely "as a professional courtesy," Def. Br. 36, Schilling's warning indicates that it was inspired by continuing suspicion. He informed Deloitte of the discrepancy Bear Stearns had uncovered and of Berger's multiple-broker explanation; he then urged Deloitte to be "keen and careful" in its audit.

whether Busson had "chosen to conduct further diligence on the Fund." Appx. to Def. Br. A1051-52 (Dep. of Fredrik Schilling). Busson replied that he had tried but Berger had refused to release the requested financial information without a confidentiality agreement (which Busson's lawyers advised him not to sign). Consequently, EIM was redeeming or recommending that its clients' redeem their investments in the Fund. While Bear Stearns is quick to point out that hedge funds are often protective of their financial information, the fact that EIM was ending its investment in the Fund could not have alleviated any lingering concern of Bear Stearns. Even after receiving word from Deloitte that the Fund's audit had been completed without incident, Schilling never stopped his inquiry into the Fund. See infra.

While we agree with the Bankruptcy Court that Bear Stearns was on inquiry notice, we emphasize in light of our reliance on Bear Stearns's own actions to evaluate the reasonable prime broker standard, that Bear Stearns investigative actions may equally serve as evidence of its good faith.

### B. Diligence

Bear Stearns may prevail on its good faith defense, however, if its investigation of the Fund was diligent.

See In re Agric. Research and Tech. Group, Inc., 916 F.2d at 535-36. Here, we depart from the Bankruptcy Court's decision and find that summary judgment was improvidently granted. As noted, Bear Stearns took a variety of steps to uncover the truth about the Fund. We cannot say that no reasonable jury could find that Bear Stearns's actions were diligent.[36]

The Trustee's argument, which was accepted below,[37] is that it would have been easy for Bear Stearns to have discovered that Berger's multiple-prime broker explanation was false. Pl. Br. 47. The Trustee points to the actions that Bear Stearns took in December 1999, namely contacting credit bureaus and other prime brokers in December 1999 – who reported that they had no relationship with the Fund – and obtaining the Fund's financial statements – which revealed that Berger's story was false. The Trustee contends that Bear Stearns should have taken these steps earlier which would have led to an earlier report to the SEC.

Bear Stearns, however, emphasizes that there were other warning signs that followed well after Berger told

---

[36] In our analysis, we draw all reasonable inferences in favor of Bear Stearns. In re M. Silverman Laces, Inc., 2002 WL 31412465 at *3.

[37] See In re Manhattan Investment Fund, 359 B.R. at 526.

Bear Stearns that he used numerous prime brokers and which resulted in their enhanced investigation. In February of 1999, Bear Stearns witnessed at least one institution pull its investments from the Fund. In December 1999, Schilling learned that a former marketer was suing Berger for breach of contract. Also in December 1999, Schilling received a disturbing update from a third-party investor. Schilling had previously suggested a list of questions for the investor (who was conducting due diligence) to ask the Fund. When Schilling saw the Fund's "unresponsive" answers, his level of concern increased. Def. Br. 39.

Given the change in circumstances and the new reasons to question Berger's multiple prime broker explanations, we cannot conclude as a matter of law that Bear Stearns should have done in December 1998 what it eventually did in December 1999. While the Trustee contends that Bear Stearns was not entitled to wait until December 1999, at the summary judgment stage, Bear Stearns is entitled to the inference that Berger's explanation was not only facially plausible, but also comforting.[38] The record does indicate that hedge funds often use more than one prime broker.

---

[38] The parties' experts argue about whether Berger's explanation was plausible but the Trustee's expert does not definitively show that it was unreasonable for Bear Stearns to accept that the Fund had made enough money with other prime brokers to net a 20% gain for the year.

Thus, although Bear Stearns does not argue that it needed to do nothing more after its call with Berger, the gradual approach it took to its investigation should be viewed in light of the fact that the conference call with Berger did not produce a smoking gun. Another factor that we consider is that the law does not charge prime brokers with "know-your-customer" responsibilities in situations involving an introducing broker.[39]

Finally, we note a number of the proactive efforts that Bear Stearns will no doubt rely upon to demonstrate that it acted diligently and in good faith. For example, while Bear Stearns was under no legal obligation to contact the Fund's auditors, it informed Deloitte of a potential problem, relied on Deloitte's positive response,[40] and yet continued to follow up with Deloitte. When Schilling met a Deloitte partner at a conference in December, he inquired

---

[39] This set of duties requires a broker to "use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted . . . ." De Kwiatkowski v. Bear, Stearns & Co., Inc., 306 F.3d 1293, 1310 (2d Cir. 2002). Here, the introducing broker, FAM, had those duties. However, this fact should not be construed as meaning that Bear Stearns was entitled to do nothing. Given what Bear Stearns learned, taking no steps at all would have amounted to "willful ignorance," which would have defeated the good faith defense. See In re Manhattan Fund, 359 B.R. at 525 (citing In re World Vision Entm't, 275 B.R. at 659-60).

[40] The Trustee disputes whether Deloitte told Bear Stearns that the Fund was in good standing but this is a question for a jury.

about the Fund and discovered that the Deloitte entity that he thought had audited the Fund did not have the Fund as a client. Appx. to Def. Br. A978 (Dep. of Fredrik Schilling). This led Schilling to contact the investor for whom he had drafted questions to ask the Fund.[41] Id. When he saw that the Fund had provided answers that were "evasive" and "vague at best," Schilling went to Bear Stearns's senior management. Id. at A1080-81. It is undisputed that what Bear Stearns did next – in contacting other prime brokers, obtaining the Fund's financial statements, and informing the SEC of the Fund's misrepresentations – was diligent.

In sum, we find that there are genuine issues of material fact as to whether the proactive steps taken by Bear Stearns demonstrated diligence in its investigation of the Fund. Thus, trial will be necessary on this issue.

---

[41] This was the same investor who later provided Schilling with a document containing the Fund's answers to the questions Schilling had drafted. Schilling found these answers to be unresponsive and Bear Stearns portrays this as the last straw. He then had Bear Stearns contact credit bureaus about the Fund and discovered that the Fund did not use more than one prime broker.

58

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's decision is affirmed in part and reversed in part.

**IT IS SO ORDERED.**

DATED:     New York, New York
           December 17, 2007

_(signature)_

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing have been mailed on this date to the following:

Counsel for Chapter 11 Trustee

Daniel E. Reynolds, Esq.
Lankler Siffert & Wohl LLP
500 Fifth Avenue
New York, NY 10110

Counsel for Bear, Stearns

Harry S. Davis, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022